AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*     )          Case No. 20-sc-2054
INFORMATION ASSOCIATED WITH TEN ACCOUNTS          )
STORED AT PREMISES CONTROLLED BY GOOGLE           )
INC., PURSUANT TO 18 U.S.C. 2703 FOR              )
INVESTIGATION OF VIOLATION OF 18 U.S.C. 1344      )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Information associated with ten accounts stored at premised controlled by Google Inc. pursuant to 18 U.S.C. § 2703 for investigation of violation of 18 U.S.C. § 1344 (as further described in Attachment A)

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

evidence of violations of 18 U.S.C. §§  641 (Theft of Government Property), 1343 (Wire Fraud), 1344 (Bank Fraud) and 1956 (Money Laundering) (as further described in Attachment B)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 641 | Theft of Government Property |
| § 1343 | Wire Fraud |
| § 1344 | Bank Fraud |
| § 1956 | Money Laundering |

The application is based on these facts:

Please see attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Rzepecki, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

2020.08.10 17:19:34 -04'00'

Date:   08/10/2020          _____
                            *Judge's signature*

City and state:  Washington, D.C.          G. Michael Harvey, U.S. Magistrate Judge
                                           _____
                                           *Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched or* )
*identify the person by name and address)* )
INFORMATION ASSOCIATED WITH TEN ACCOUNTS )    Case No.  20-sc-2054
STORED AT PREMISES CONTROLLED BY GOOGLE LLC )
PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF )
VIOLATION OF 18 U.S.C. 1344 )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the     Northern     District of     California

*(identify the person or describe the property to be searched and give its location)*:

Information associated with serviceanimalsofamerica@gmail.com; ▮▮▮▮▮▮▮ gmail.com; certapet@gmail.com; madams6119@gmail.com; certifytherapydog@gmail.com; esaregistryinternational@gmail.com; richard.s.vost@gmail.com; kengaughan@gmail.com; intlserviceanimal@gmail.com; and rstrauski@gmail.com stored at premised controlled by Google LLC pursuant to 18 U.S.C. § 2703 for investigation of violations of 18 U.S.C. §§ 641 (Theft of Government Property), 1343 (Wire Fraud), 1344 (Bank Fraud) and 1956 (Money Laundering) (as further described in the attached affidavit in support of search warrant, incorporated fully herein, including Attachment A)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Evidence, fruits, and instrumentalities evidence of violations of 18 U.S.C. §§ 641 (Theft of Government Property), 1343 (Wire Fraud), 1344 (Bank Fraud) and 1956 (Money Laundering) (as further described in the attached affidavit in support of search warrant, incorporated fully herein, including Attachment B)

**YOU ARE COMMANDED** to execute this warrant on or before     August 24, 2020     *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     the Honorable G. Michael Harvey    .
                                                  *(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:    08/10/2020

*2020.08.10 17:20:09 -04'00'*

*Judge's signature*

City and state:    Washington, DC

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 20-sc-2054 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information which is associated with the Google LLC accounts identified by serviceanimalsofamerica@gmail.com; ███████████@gmail.com; certapet@gmail.com; madams6119@gmail.com; certifytherapydog@gmail.com; esaregistryinternational@gmail.com; richard.s.vost@gmail.com; kengaughan@gmail.com; intlserviceanimal@gmail.com; and rstrauski@gmail.com, and which are stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

## <u>ATTACHMENT B</u>

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

I.      **Information to be disclosed by Google LLC ("PROVIDER 1")**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER 1, including any records that have been deleted but are still available to PROVIDER 1, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER 1 is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.      For the time period from January 1, 2020 to the Present: The contents of all communications and related transactional records for all PROVIDER 1 services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies);[8]

---

[8] PROVIDER 1's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with

b.      For the time period from January 1, 2020 to the Present: The contents of all other data and related transactional records for all PROVIDER 1 services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER 1 in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period from January 1, 2020 to the Present: All records of PROVIDER 1 concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period January 1, 2020 to the Present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of

driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

  f. All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

  g. Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER 1 account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number),

registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.    All information held by PROVIDER 1 related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-provider based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.    For the time period January 1, 2020 to the Present:  All records of communications between PROVIDER 1 and any person regarding the Account, including contacts with support services and records of actions taken;

j.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

Special Agent Daniel Rzepecki

Federal Bureau of Investigation

2600 Lord Baltimore Drive

Baltimore, MD  21244

drzepecki@fbi.gov

II.    **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1344 (bank fraud), 641 (theft of government money or property), 1343 (wire fraud), and 1956 (money laundering) as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

   (a) Information that constitutes evidence of the identification or location of the user(s) of the Account;

   (b) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

   (c) Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

   (d) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

   (e) Information that constitutes evidence concerning the preparation and submission of fraudulent applications under the Paycheck Protection Program (PPP) and (EIDL) program; communication about the applications; communication with any other

5

individuals involved in the fraud scheme; and any information about the disposition of proceeds from the illegal activity.

**III.      Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TEN ACCOUNTS STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. 1344 | SC No. 20-sc-2054 <br><br> **Filed Under Seal** |

*Reference:     USAO Ref. # 2020R01633; Subject Account(s):*
*serviceanimalsofamerica@gmail.com;* ▓▓▓▓▓▓▓ *@gmail.com; certapet@gmail.com;*
*madams6119@gmail.com; certifytherapydog@gmail.com;*
*esaregistryinternational@gmail.com; richard.s.vost@gmail.com; kengaughan@gmail.com;*
*intlserviceanimal@gmail.com; rstrauski@gmail.com; help@esapet.org; and Paxton7@aol.com*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Rzepecki, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this identical affidavit in support of three separate applications for three separate search warrants for (1) information which is associated with ten accounts – that is, serviceanimalsofamerica@gmail.com; ▓▓▓▓▓▓▓ @gmail.com; certapet@gmail.com; madams6119@gmail.com; certifytherapydog@gmail.com; esaregistryinternational@gmail.com; richard.s.vost@gmail.com; kengaughan@gmail.com; intlserviceanimal@gmail.com; and rstrauski@gmail.com – which are stored at premises controlled by Google LLC ("PROVIDER 1"), an electronic communications services provider and/or remote computing services provider which is headquartered at 1600 Amphitheatre Parkway, Mountain View, California; (2) information which is associated with one account – that is, help@esapet.org – which is stored at premises controlled by GoDaddy.com, LLC ("PROVIDER 2"), an electronic communications services provider and/or remote computing services provider which is headquartered at 14455 N.

Hayden Road, #219, Scottsdale, Arizona 85260; and (3) information which is associated with one account – that is, Paxton7@aol.com – which is stored at premises controlled by Oath, Inc. ("PROVIDER 3"), an electronic communications services provider and/or remote computing services provider which is headquartered at 22000 AOL Way, Dulles, Virginia 20166. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER 1, PROVIDER 2, and PROVIDER 3 to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been in this position since October 2008. I am currently assigned to the Baltimore Field Office where I conduct complex financial crime investigations. I have duties that include investigations of, among other things, bank fraud, mail fraud, wire fraud, health care fraud, and money laundering. Through my twenty-one (21) weeks of training at the FBI Academy and my participation in searches and arrests conducted by my squad and other squads, I have assisted and/or participated in the preparation and/or execution of multiple search and arrest warrants. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1344 (bank fraud), 641 (theft of government money or property), 1343 (wire fraud), and 1956 (money laundering) have been committed by at least Kenneth Patrick Gaughan.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.  A statute setting forth one of the federal offenses under investigation, namely 18 U.S.C. § 1956 (Money Laundering), applies extraterritorially.

## PAYCHECK PROTECTION PROGRAM

6.      As discussed in this affidavit, **Gaughan** is actively defrauding the federal Payment Protection Program, which this section briefly describes.

7.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349

billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In April 2020, Congress authorized over $300 billion in additional PPP funding.[1]

8.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its average monthly payroll expenses and number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the program. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

9.      A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own money, which is 100 percent guaranteed by Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

10.      The small business must use the PPP loan proceeds on certain permissible expenses, specifically, payroll costs, interest on mortgages, rent, and utilities. The program allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on

---

[1] All dates and amounts are approximations. The words "on or about" and "approximately" are omitted for clarity.

the allowable expenses within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

## ECONOMIC INJURY DISASTER LOANS

11.     As discussed in this affidavit, **Gaughan** is actively defrauding the federal Economic Injury Disaster Loan ("EIDL") program, which this section briefly describes.

12.     In response to the COVID-19 pandemic, small business owners and non-profit organizations in all U.S. states, Washington DC, and territories are able to apply for an EIDL. EIDL is an existing SBA program designed to provide economic relief to businesses that are currently experiencing a temporary loss of revenue.  EIDL provides loan assistance, including up to $10,000 advances, for small businesses and other eligible entities for loans up to $2 million. The EIDL proceeds can be used to pay fixed debts, payroll, accounts payable and other bills that could have been paid had the disaster not occurred; however, such loan proceeds are not intended to replace lost sales or profits or for expansion of a business.  Unlike certain other types of SBA-guaranteed loans, EIDL funds are issued directly from the United States Treasury and applicants apply through the SBA via an online portal and application.  The EIDL application process, which also uses certain outside contractors for system support, collects information concerning the business and the business owner, including: information as to the gross revenues for the business prior to January 31, 2020; the cost of goods sold; and information as to any criminal history of the business owner.  Applicants electronically certify that the information provided is accurate and are warned that any false statement or misrepresentation to SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

**PROBABLE CAUSE**

13.     For more than seven years, **Kenneth Patrick Gaughan** ("**Gaughan**"), a long-time employee of the Catholic Archdiocese of Washington, DC ("ADW" or "the archdiocese"), fraudulently diverted money from ADW to contractors **Gaughan** surreptitiously owned and that provided virtually no legitimate services to ADW.  In late 2018, a federal grand jury in the District of Maryland charged **Gaughan** with mail fraud.  In December 2019, that indictment was dismissed for lack of venue.  However, in July 2020, based on the fraud **Gaughan** executed against ADW, a grand jury in the District of Columbia indicted **Gaughan** with mail fraud, wire fraud, and money laundering.

14.     During the investigation of the fraud that **Gaughan** committed against ADW, your affiant identified **Person 1** (hereinafter **"Person 1"**) as **Gaughan**'s cohabitant in **Gaughan**'s former residence and as the joint account holder on several of **Gaughan**'s bank accounts and credit cards.  That is, your affiant learned that **Person 1** resided with **Gaughan** at **Gaughan**'s U Street residence in the ▓▓▓▓▓▓▓ neighborhood.  In May 2018, your affiant obtained a copy of a ▓▓▓▓▓▓▓▓▓▓▓ article about **Person 1** stating that **Person 1** "owns a house in ▓▓▓▓▓▓▓▓ with his friend **Ken Gaughan**."  Further, bank records for bank and credit card accounts on which **Gaughan** and **Person 1** were joint accountholders show that **Gaughan** and **Person 1** were joint accountholders for BB&T accounts ending in 7875, 0952, and 2616.  In addition, **Gaughan** and **Person 1** were cardholders and authorized users on a US Bank credit card ending in 4376, which

was opened in January 2013, and Barclays Bank credit cards ending in 2023 and 2024, opened in November 2013.[2]

15.      On July 17, 2020, your affiant discovered that **Gaughan** was attempting to commit fraud on the EIDL and PPP programs.  Specifically, your affiant was informed that **Gaughan** and **Person 1** fraudulently applied for 11 PPP loans to SBA lenders.  Records show that **Gaughan** and **Person 1** submitted those PPP loan applications using the business names of at least eight bogus emotional support animal companies, including Service Animals of America Incorporated, Service Dog of America Incorporated, Certapet Incorporated, Official Service Dogs Incorporated, Therapeutic Solutions Incorporated, Therapy Dog Incorporated, Therapy Dog International Incorporated, and ESA Registry International Incorporated.[3]

16.      Further, according to the PPP loan applications, **Gaughan** and **Person 1**'s purported service animal companies each have twenty-five (25) employees and are located at a single private mailbox in the UPS Store at 1030 15th Street, NW, Suite 170-B1, Washington, DC ("the 15th Street UPS box").

17.      Records from UPS show that **Gaughan** applied for and rents the 15th Street UPS box.  The evidence detailed in this affidavit otherwise shows that **Gaughan** made extensive use of the 15th Street UPS box when defrauding ADW.

---

[2] According to law enforcement databases, **Person 1** currently resides at an address different from the U Street address and ▆▆▆▆▆▆ NE, Washington, DC.  Thus, your affiant believes that **Gaughan** and **Person 1** no longer reside together.

[3] **Person 1** also submitted a loan application under the business name ▆▆▆▆▆▆▆▆▆▆ a food science and nutrition consulting firm. According to **Person 1**'s biography posted on the website of ▆▆▆▆▆▆▆▆▆ where **Person 1** is an ▆▆▆▆▆▆▆▆, **Person 1** is the ▆▆▆▆▆▆▆▆ of ▆▆▆▆▆▆▆▆▆

18.    **Gaughan** also fraudulently applied for 12 EIDLs. Records show that **Gaughan** applied for these loans utilizing nine of the above-mentioned suspected bogus service animal-related businesses. The twelve (12) businesses used to submit EIDL applications are Therapeutic Solutions Incorporated, Anything Pawsable Incorporated, Therapy Pet Inc, Therapy Dog International, ESA Registry International, Official Service Dogs, Service Dog of America, Certapet Incorporated, Service Animals of America, International Service Animals, Therapy Dog Inc, and US Therapy Dog.

19.    **Gaughan's** name and Social Security Number is the business listed contact for all 12 of the EIDL applications. The business addresses provided are variations of the 15th Street UPS box provided for PPP applications. All applications shared a common business phone number of ▆▆▆▆-4390, mobile phone contact number of ▆▆▆▆-2357, and contact address of ▆▆▆▆ ▆▆▆ NE, Washington, DC, 20002.

20.    Nine of the 12 entities used to apply for EIDLs shared the same Taxpayer Identification Number (TIN) and business name as entities used to apply for PPP loans. The number of employees per each respective application contradicted each other. The PPP loan applications claimed these entities each had twenty-five (25) employees while the EIDL application stated three (3) employees per entity. Additionally, see below for a summary of the applicant for PPP loans and EIDLs between the like entities:

| PPP | | | EIDL | | |
|---|---|---|---|---|---|
| Borrower TIN | Borrower | Applicant | Borrower TIN | Borrower | Applicant |
| ▆3968 | THERAPETIC SOLUTIONS | ▆▆▆▆ | ▆3968 | Therapetic Solutions Inc | Kenneth Gaughan |
| ▆2437 | Service Animals of America | Kenneth Gaughan | ▆2437 | Service Animals of America | Kenneth Gaughan |
| ▆1136 | ESA Registry International | ESA Registry International | ▆1136 | ESA Registry International | Kenneth Gaughan |
| ▆1218 | Certapet Inc | Kenneth Gaughan | ▆1218 | Certapet Inc | Kenneth Gaughan |
| ▆1090 | Therapy Dog Inc | ▆▆▆▆ | ▆1090 | Therapy Dog Inc | Kenneth Gaughan |
| ▆0847 | THERAPY DOG INTERNATIONAL | ▆▆▆▆ | ▆0847 | Therapy Dog International | Kenneth Gaughan |
| ▆2288 | Service Dog of America | Kenneth Gaughan | ▆2288 | Service Dog of America | Kenneth Gaughan |
| ▆1364 | Therapy Pet Inc | ▆▆▆▆ | ▆1364 | Therapy Pet Inc | Kenneth Gaughan |
| ▆7450 | Official Service Dogs | ▆▆▆▆ | ▆7450 | Official Service Dogs | Kenneth Gaughan |

21.     **Gaughan** provided Bank of America account number ██████9804 for the proceeds for nine (9) of twelve (12) EIDLs. He provided the same account for proceeds of at least one PPP loan, for Service Animals of America. **Gaughan** provided Bank of America account number ██████6270 for proceeds on two (2) EIDLs, the same account provided for proceeds of at least one (1) PPP loan for Certapet Incorporated.

## I.     *SCHEME TO DEFRAUD ARCHDIOCESE OF WASHINGTON*

22.     The scheme to defraud ADW is described in detail in the above-referenced indictment, filed as D.D.C. Case No. 20-cr-128, incorporated herein by reference.  For ease of reference, the scheme is also summarized here.  ADW is a religious organization that covers the District of Columbia and parts of Maryland. ADW operates schools and provides counseling, shelter, adoption and foster care, health care, immigration and legal aid, and affordable housing to its parishioners.

23.     In 2008, ADW hired **Gaughan** as its Director of Counseling, and in July 2013 made **Gaughan** the archdiocese's Assistant Superintendent, a position **Gaughan** held until he formally resigned in April 2018.  In those capacities, **Gaughan** was responsible for recruiting and acting as the point of contact for ADW's contractors, particularly those that instituted anti-bullying and crisis intervention programs for the archdiocese.

24.     As alleged in the indictment and found in the earlier investigation, **Gaughan** devised and executed a scheme to defraud ADW by, among other things, causing ADW to make payments to purported companies that were actually payments to **Gaughan**.  For example, **Gaughan** caused ADW to issue a check to ████Company 2████, which was deposited into an account controlled by **Gaughan**.  **Gaughan** also caused ADW to pay two other illegitimate companies, ████Company 1████ and Soulutions Counseling

for Youth ("SCY"), more than $450,000 from ADW bank accounts, and **Gaughan** falsely represented to ADW officials that [Co.1] nd SCY implemented social programs for the benefit of ADW. **Gaughan** then used that money on personal expenditures and to extricate himself from personal debt. The following sections describe **Gaughan**'s fraud on ADW in greater detail.

25.    [Company 2].    In 2018, in connection with the [Co.2] entity, **Gaughan** used the alias **Richard Strauski** ("**Strauski**") to open a virtual mailbox through which **Gaughan** defrauded and/or attempted to defraud ADW. The application for this mailbox listed the applicant's home address as the 15th Street UPS box, and, in connection with this application, **Gaughan** also provided a bogus residential lease agreement purportedly showing **Strauski**'s rental of this address. On March 15, 2018, **Gaughan** submitted a fraudulent [Co.2] invoice for $21,060 to ADW's Finance Office with a request for payment, *i.e.*, a recommendation that ADW pay [Co.2] ADW issued a check to [Co.2] which was mailed to the virtual mailbox, to pay for the fraudulent invoice. The invoice requested payment from ADW to [Co.2] to provide a school messaging service for the 2018 calendar year – a service which ADW was already receiving from a legitimate entity. On April 17, 2018, **Gaughan** deposited the $21,060 [Co.2] check into a bank account he controlled. ADW would not have issued the check had ADW realized that **Gaughan** was the beneficiary of that payment.

26.    This earlier investigation also showed how **Gaughan**'s use of digital devices to perpetrate the fraud led to evidence of his offenses being stored on digital devices at his workplace and home. For example, a PDF of a lease agreement used in connection with the [Co.2] scheme was also found on **Gaughan**'s ADW computer. An edited version of the lease agreement was also later found on **Gaughan**'s personal MacBook. Similarly, a search of the ADW computer assigned to **Gaughan** revealed various forgeries connected to his fraud scheme, including an image of a

District of Columbia driver's license that displayed **Gaughan**'s photograph and the name **Richard Strauski** (*i.e.*, **Gaughan**'s real license with the name altered), a forged certificate from the Nebraska Secretary of State purporting that **Gaughan** does business as ████████, and a copy of the fraudulent [Co.2] invoice **Gaughan** submitted to ADW's Finance Office in Microsoft Word format.

27.    [Company 1].  In June 2011, by falsely representing information about [Co.1] including its purported but non-existent previous work with other dioceses and archdioceses, **Gaughan** persuaded ADW to contract with [Co.1] to implement web-based anti-bullying modules that were purportedly required under Maryland law. The original contract, which was effective from June 20, 2011 through June 30, 2014, was for $136,701.  On **Gaughan**'s recommendation, in June 2011, ADW issued [Co.1] a check for $136,701, which **Gaughan** deposited into a [Co.1] account he controlled.  Thereafter, in 2014 and 2015, **Gaughan** submitted for approval [Co.1] invoices for other large payments, which ADW issued and **Gaughan** deposited into the [Co.1] account **Gaughan** controlled.  The real [Co.1] (in the United Kingdom) has no association with **Gaughan** and does no work in the United States.

28.    ***Soulutions Counseling for Youth ("SCY").***  In late 2010, by falsely representing information about SCY, including by using **Strauski**'s identity and concealing **Gaughan**'s own involvement, **Gaughan** persuaded ADW to pay SCY for anti-bullying and crisis intervention programs. Bank records show that those payments were deposited into a bank account **Gaughan** opened in the SCY business name and over which **Gaughan** was the sole signer.

29.    ADW records show that between May 2010 and April 2018, the archdiocese issued twenty-six (26) checks to [Co.2] [Co.1] and SCY.  The aggregate value of those checks was $472,832.  Financial records show that **Gaughan** deposited the twenty-six (26) ADW checks into

accounts **Gaughan** controlled as the sole signer, that the company bank accounts were almost entirely funded by ADW's money, and that **Gaughan** used ADW's money for his personal benefit and not to operate legitimate businesses.[4]  For example, financial records show that **Gaughan** spent over \$185,000 in fraudulent proceeds from the [Co.1] and SCY accounts to pay for debt incurred on fourteen (14) personal credit cards. **Gaughan** also spent the money credited to the company bank accounts on gambling, entertainment, the mortgage on his home, and a boat.

30.    Bank records reflect no paychecks issued from the company accounts to any employees or contractors.  Records from the IRS also show that neither [Co.2] [Co.1] nor SCY ever issued Forms W-2 or 1099 to any employees or contractors, and records from the State of Oregon – the state in which **Gaughan** registered [Co.1] – show that there were no wage payments to anyone who worked for [Co.1] .  Thus, along with other third-party records, the financial records show that [Co.2] [Co.1] and SCY were shell companies **Gaughan** used to illegally enrich himself at the expense of ADW, and were not legitimate businesses. Each of the shell companies **Gaughan** used to defraud ADW (*i.e.*, [Co.2] , [Co.1] and SCY) were associated with the 15th Street UPS box. [5]

---

[4] From your affiant's review of the financial records, the only significant payment made for the benefit of ADW was a \$10,000 payment to a company called Connect With Kids ("CWK") for an anti-bullying website. **Gaughan** made this payment from the [Co.1] bank account. **Gaughan** then converted the \$10,000 contract he signed with CWK into the original \$136,701 contract [Co.1] entered into with ADW, netting himself a 1,200 percent return on investment at ADW's expense.

[5] The address listed on the application for an account with PNC for [Co.1] is a UPS box that was located at 1718 M Street NW, Suite 170, Washington, DC ("the M Street address"). Records from UPS show that "**Kenneth Gaughan**" of "Soulutions Counseling for Youth" opened the private mailbox on May 20, 2010.  According to the UPS Store manager, the UPS Store at the M Street address later moved to 1030 15th Street NW, Washington, DC, and **Gaughan**'s private mailbox was converted into the 15th Street UPS box.  According to the manager of that particular UPS Store, once the store moved to 1030 15th Street NW, Washington, DC, mail that was sent to the M Street address was forwarded to **Gaughan**'s 15th Street UPS box. In other words, the 15th Street UPS box was effectively the address listed on the [Co.1] bank account.

31. ***Search Warrant on Gaughan's U Street Residence.*** On September 25, 2018, your affiant and other agents executed a federal search warrant on **Gaughan**'s U Street residence. While executing the warrant, agents encountered **Gaughan** and ▮▮▮▮▮▮▮▮▮▮. Agents interviewed **Gaughan**, who waived his *Miranda* rights and made a number of incriminating statements, including (1) that his (**Gaughan**'s) photograph was depicted on the fraudulent **Strauski** driver's license image found on the ADW computer that had previously been assigned to **Gaughan**, (2) that **Strauski** was fictitious, (3) that **Gaughan** thought the evidence of his guilt was overwhelming, (4) that **Gaughan** was in significant personal debt, and (5) that **Gaughan** was sorry for what he did to ADW.

32. Further, in **Gaughan**'s residence, agents found evidence of his financial fraud scheme, including paper receipts for Co.1 and SCY checks deposited into the fraudulent company bank accounts, statements for those bank accounts, a Form 1099 reflecting the fraudulent payments from ADW to SCY in 2010, and the Co.1 State of Oregon registration form.

33. Agents found two MacBook computers that contained inculpatory evidence, including a .png file of **Strauski**'s signature, emails showing **Gaughan**'s control of the mail boxes used for the fraudulent corporate entities, and a fraudulent Co.2 lease agreement. Agents also found several checks from Therapeutic, an entity later used in the loan fraud scheme described below.

## II. *FRAUD ON THE SBA'S PAYCHECK PROTECTION PROGRAM (PPP)*

34. As described above, in July 2020, your affiant learned that **Gaughan** and **Person 1** submitted eleven (11) loan applications for businesses listing the address as the 15th Street UPS box. Your affiant knows that it is indicative of fraud when multiple businesses are located at a single address, particularly when that address is a private mailbox, and where numerous loan

applications were submitted for different companies containing the same or similar information, including the same address and number of employees, and similar average monthly payroll amounts. Furthermore, your affiant knows that those who utilize private mailboxes often use those private boxes to receive mail, but then store that mail in their homes.

35.    Even though all of the businesses were purportedly located at the same private UPS mailbox, the loan applications listed each business as having twenty-five (25) employees (for a total of at least 200 employees) and an average monthly payroll exceeding $110,000. The names of each of these businesses indicates they are engaged in similar business activity—registering emotional support animals.

36.    **Gaughan** worked full-time for ADW for almost a decade until he resigned in April 2018, and in early 2018, **Gaughan**'s LinkedIn profile does not reflect any involvement with animal support services.

37.    Further, your affiant reviewed **Gaughan**'s federal income tax returns for the tax years 2011 through 2018.  In doing so, your affiant found no indication that **Gaughan** operated or worked with any animal support companies, or that **Gaughan** paid employees to work for animal support companies.

38.    SBA and Bank of America records reflect that seven (7) of the eleven (11) loans have been disbursed, with a total disbursed amount of $2,179,465.00. All disbursed funds were deposited into two accounts at Bank of America in the names of Therapy Dog International or Therapetic Solutions Inc.

39.    Specifically, according to SBA records, **Gaughan** submitted applications for the following four (4) PPP loans for businesses located at the 15th Street UPS box; three (3) of these loans were disbursed:

**Loan Number** ████ **7206**: **Gaughan** applied for Loan Number ████ 7206 through the lender Fund-Ex Solutions Group LLC under the business name Service Animals of America, and listed the business address for Service Animals of America as the 15th Street UPS box. According to the loan application documents, Service Animals of America has twenty-five (25) employees and an average monthly payroll of $121,215. **Gaughan**'s address listed on this loan application is ████████ Washington, DC. The loan was approved in the amount of $303,000, and the outstanding balance is $303,000. As of June 6, 2020, the loan status was "past due disbursed" according to SBA records. The email address listed on the application is serviceanimalsofamerica@gmail.com.

**Loan Number** ████ **7308**: **Gaughan** applied for Loan Number ████ 7308 through Celtic Bank Corporation under the business name Service Dog of America, and listed the business address for Service Dog of America as the 15th Street UPS box. According to the loan application documents, Service Dog of America has twenty-five (25) employees and an average monthly payroll of $121,215. **Gaughan**'s address listed on this loan is the ████ ████████ Washington, DC. According to SBA records, Celtic Bank cancelled this loan in May 2020. The email address listed on the PPP loan application is kengaughan@gmail.com.

**Loan Number** ████ **7409**: **Gaughan** applied for Loan Number ████ 7409 through Radius Bank under the business name Certapet Incorporated, and listed the business address for Certapet Incorporated as the 15th Street UPS box. According to the loan application documents, Certapet Incorporated had twenty-five (25) employees and an average monthly payroll of $121,215. **Gaughan**'s address listed on this loan is listed as the 15th Street UPS box. The loan was approved in the amount of $303,100, and the outstanding balance is $303,038. As of June 5, 2020, the loan status was "disbursed." The email address listed on the PPP loan application is certapet@gmail.com.

**Loan Number** ████ **7306**: The application for Loan Number ████ 7306 was submitted to First Bank of the Lake under the business name ESA Registry International, and listed the business address for ESA Registry International as the 15th Street UPS box. According to the loan application documents, ESA Registry International has twenty-five (25) employees and an average monthly payroll of $151,325. The loan was approved in the amount of $378,310.00, and the outstanding balance is $378,310. As of June 6, 2020, the loan status was "disbursed current." Law enforcement has not yet received information about what email address was listed on the PPP loan application.

40.     In addition, according to SBA records, the following seven (7) loans for businesses,

all of which are purportedly located at the 15th Street UPS box, were applied for in **Person 1**'s

name; at least four (4) of those PPP loans have been disbursed:

**Loan Numbers** ████ **7402 &** ████ **7807**: Loan Number ████ 7402 was applied for in **Person 1**'s name through Northeast Bank under the business name Official Service Dogs. The business address for Official Service Dogs listed on the PPP loan application is

the 15th Street UPS box. According to the loan application documents, Official Service Dogs has twenty-five (25) employees and an average monthly payroll of $121,215. Loan Number ████7402 was cancelled.

According to information Northeast Bank provided, after Loan Number ████7402 was cancelled, the borrower provided information that had been requested by the bank. As a result, Northeast Bank approved Loan Number ████7807 for business name Official Service Dogs, with the address listed as the 15th Street UPS box, in the amount of $303,000. According to the loan application documents, Official Service Dogs has twenty-five (25) employees and an average monthly payroll of $121,200. Additional documentation provided included a bogus residential lease agreement signed by tenant **Person 1** on behalf of Official Service Dogs and landlord ████████ This lease agreement was a version of the same fraudulent lease documents mentioned above found on **Gaughan**'s ADW computer and personally owned MacBook. As of June 5, 2020, this loan status was "active but undisbursed" according to SBA records. According to information received from Northeast Bank, this loan was closed and funded on June 9, 2020. The email address listed on the PPP loan application is ████████@gmail.com. Further, based on information received from Northeast Bank, ████████@gmail.com was used to correspond with Northeast Bank regarding PPP Loan ████7807. The correspondence between the writer of the email and Northeast Bank included a number of assertions and the exchange of documents that are suspected to be fraudulent. For example, on May 18, 2020, the email author stated that Official Service Dogs "took over the Therapetic name in 2017" and provided a transfer agreement purportedly signed by a "Mary Adams" as President of Therapeutic Solutions, Inc. and notarized by "Jorge Loredo, Esq." A search of the DC Bar website revealed no member by the name of Jorge Loredo. The email writer stated that they are "often confused with Therapetic website www.therapetic.org is a different organization and not affiliated with us." According to GoDaddy LLC, an account with login "kennethpgaughan" reserved internet domains including therapetic.org and therapetic.us.

**Loan Number ████ 709**: Loan Number ████7709 was applied for in **Person 1**'s name through Bank of America under the business name Therapetic Solutions. The business address for Therapetic Solutions listed on the loan application is the 15th Street UPS box. According to the loan application documents, Therapetic Solutions has twenty-five (25) employees and an average monthly payroll of $122,937. The loan was approved in the amount of $307,342 and, according to Bank of America, was disbursed on May 4, 2020. Bank of America's PPP loan application did not ask applicants to list an email address, and none was listed on this application.

**Loan Number ████7303**: Loan Number ████ 303 was applied for in **Person 1**'s name through Kabbage Incorporated under the business name Therapy Dog Incorporated. The business address for Therapy Dog Incorporated listed on the loan application is the 15th Street UPS box. According to the loan application documents, Therapy Dog Incorporated has twenty-five (25) employees and an average monthly payroll of $110,973. The loan was approved in the amount of $277,432, and the outstanding balance is

$277,432. As of June 9, 2020, the loan status was "disbursed" according to SBA records. The email address listed on the PPP loan application is richard.s.vost@gmail.com.

**Loan Number** ███**7708**: Loan Number ███7708 was applied for in **Person 1**'s name through Bank of America under the business name Therapy Dog International. The business address for Therapy Dog International listed on the loan application is the 15th Street UPS box. According to the loan application documents, Therapy Dog International has twenty-five (25) employees and an average monthly payroll of $122,937. The loan was approved in the amount of $307,343.00 and, according to Bank of America, the loan was "disbursed" on May 4, 2020. Bank of America's PPP loan application did not ask applicants to list an email address, and none was listed on this application.

**Loan Number** ███**7901**: Loan Number ███7901 was applied for in **Person 1**'s name through Northeast Bank under the business name Therapy Pet Incorporated. The business address for Therapy Pet Incorporated listed on the loan application is the 15th Street UPS box. According to the loan application documents, Therapy Dog Incorporated has twenty-five (25) employees and an average monthly payroll of $121,215. The loan was approved in the amount of $303,000. According to information received from Northeast Bank, the loan was cancelled on July 10, 2020. The email address listed on the PPP loan application is atdugbartey@gmail.com. Google has informed law enforcement that it has no record of this email address, so it is not included among those requested in this search warrant application.

**Loan Number** ███**7800**: Loan Number ███7800 was applied for in **Person 1**'s name through Fund-Ex Solutions Group LLC under the business name Therapy Pet Incorporated. According to SBA records, the borrower's street address was ███████, and the borrower's physical street address was the 15th Street UPS box. According to the loan application documents, Therapy Dog Incorporated has twenty-five (25) employees and an average monthly payroll of $121,215. As of May 30, 2020, the loan status was "fully cancelled." Law enforcement has not yet received information about what email address was listed on the PPP loan application.

### a. *SBA PPP Loan Application Documents*

41.     In executing an SBA Form 2483, a form required as part of the process to receive PPP funding, each Applicant was required to initial and certify that between February 15 and December 31, 2020, "the Applicant has not and will not receive another loan under the Paycheck Protection Program." Here, by receiving at least multiple PPP loans, the Applicant's signed certification on each application was false. Elsewhere on the Form 2483, applicants certified that

the information was accurate and that they knew making false statements subjected them to various criminal penalties.

42.     As of July 28, 2020, your affiant has received supporting documentation for loan applications submitted to the following institutions: Bank of America (loan number ▉▉7708); Kabbage Inc. (loan number ▉▉7303); Radius Bank (loan number ▉▉7409); Fund-Ex Solutions Group (loan numbers ▉▉7206 and ▉▉7800); Northeast Bank (loan numbers ▉▉7807 and ▉▉7901); and Celtic Bank Corporation (loan number ▉▉7308). These applications included multiple similar or identical supporting documents used under the names of different entities. For example, the same following twenty-five (25) employees and wage amounts were reported for pay periods January 1, 2020 through January 31, 2020 and February 1, 2020 through February 29, 2020 in connection with each of the eight loan numbers listed above.

| Name | Net Amount | Total Hours | Taxes Withheld | Total Pay | Employer Taxes | Total Cost |
|---|---|---|---|---|---|---|
| | $ 3,117.88 | 173.33 | $ 868.71 | $ 3,986.59 | $ 412.62 | $ 4,399.21 |
| | $ 3,433.61 | 173.33 | $ 986.31 | $ 4,419.92 | $ 457.47 | $ 4,877.39 |
| | $ 4,731.67 | 173.33 | $ 1,768.21 | $ 6,499.88 | $ 672.74 | $ 7,172.62 |
| | $ 4,410.06 | 173.33 | $ 1,569.83 | $ 5,979.89 | $ 618.92 | $ 6,598.81 |
| | $ 3,820.42 | 173.33 | $ 1,206.15 | $ 5,026.57 | $ 520.26 | $ 5,546.83 |
| | $ 4,034.85 | 173.33 | $ 1,338.38 | $ 5,373.23 | $ 556.13 | $ 5,929.36 |
| | $ 5,738.24 | 173.33 | $ 1,671.62 | $ 7,409.86 | $ 766.92 | $ 8,176.78 |
| | $ 3,021.88 | 173.33 | $ 834.71 | $ 3,856.59 | $ 399.16 | $ 4,255.75 |
| | $ 5,321.28 | 173.33 | $ 2,131.91 | $ 7,453.19 | $ 570.18 | $ 8,023.37 |
| | $ 3,309.89 | 173.33 | $ 936.70 | $ 4,246.59 | $ 439.53 | $ 4,686.12 |
| | $ 3,599.63 | 173.33 | $ 1,080.28 | $ 4,679.91 | $ 484.37 | $ 5,164.28 |
| | $ 5,160.49 | 173.33 | $ 2,032.71 | $ 7,193.20 | $ 744.50 | $ 7,937.70 |
| | $ 4,624.48 | 173.33 | $ 1,702.07 | $ 6,326.55 | $ 654.80 | $ 6,981.35 |
| | $ 4,838.88 | 173.33 | $ 1,834.33 | $ 6,673.21 | $ 690.68 | $ 7,363.89 |
| | $ 3,765.64 | 173.33 | $ 1,174.27 | $ 4,939.91 | $ 511.28 | $ 5,451.19 |
| | $ 3,514.36 | 173.33 | $ 818.89 | $ 4,333.25 | $ 448.49 | $ 4,781.74 |
| | $ 4,008.05 | 173.33 | $ 1,321.85 | $ 5,329.90 | $ 551.64 | $ 5,881.54 |
| | $ 4,383.26 | 173.33 | $ 1,553.29 | $ 5,936.55 | $ 614.44 | $ 6,550.99 |
| | $ 4,517.27 | 173.33 | $ 1,635.95 | $ 6,153.22 | $ 636.86 | $ 6,790.08 |
| | $ 5,489.15 | 173.33 | $ 1,574.05 | $ 7,063.20 | $ 731.05 | $ 7,794.25 |
| | $ 4,946.09 | 173.33 | $ 1,900.45 | $ 6,846.54 | $ 708.62 | $ 7,555.16 |
| | $ 3,765.64 | 173.33 | $ 1,174.27 | $ 4,939.91 | $ 511.28 | $ 5,451.19 |
| | $ 5,669.71 | 173.33 | $ 2,346.80 | $ 8,016.51 | $ 613.26 | $ 8,629.77 |
| | $ 4,710.80 | 173.33 | $ 1,269.09 | $ 5,979.89 | $ 618.92 | $ 6,598.81 |
| | $ 2,957.89 | 173.33 | $ 812.04 | $ 3,769.93 | $ 390.19 | $ 4,160.12 |
| Totals | $ 106,891.12 | 4333.25 | $ 35,542.87 | $ 142,433.99 | $ 14,324.31 | $ 156,758.30 |

43.     In addition to the evidence that the applications are fraudulent described above, there is further evidence in the material provided for various of the loan applications.  For example:

**Loan Number** ███**7708**: Documents provided to Bank of America to support payroll obligations for Therapy Dog International (EIN: ███0847) include Payroll Summary Reports as of February 1, 2020 for pay period January 1, 2020 through January 31, 2020, and March 1, 2020 for pay period February 1, 2020 through February 29, 2020.  The employees listed and payroll amounts per the reports are identical other than the report and check dates. Payroll Details Reports were also provided for the same period. Similar to the Payroll Summary Reports, the names and numbers on both reports were identical other than report and check dates. Each report showed twenty-five (25) employees, a total monthly pay of $144,817.27, employer taxes of $14,570.99, and total payroll costs of $159,388.26.

**Loan Number** ███**7303**: Documents provided to Kabbage Inc. to support payroll obligations for Therapy Dog Incorporated (EIN: ███1090) include Payroll Summary Reports as of February 1, 2020 for pay period January 1, 2020 through January 31, 2020, and March 1, 2020 for pay period February 1, 2020 through February 29, 2020.  Each report showed twenty-five (25) employees, a total monthly pay of $144,817.27, employer taxes of $14,570.99, and total payroll costs of $159,388.26. The documents provided were identical to the Payroll Summary and Payroll Details Reports documents provided to Bank of America for ███ 7708 except for the entity name in the right-hand corner of the document being "Therapy Dog Inc" versus "Therapy Dog International."

**Loan Number** ███**7409:** Documents provided to Radius Bank included identical Payroll Summary Reports and Payroll Details Reports for January and February 2020 as described above, except that "Certapet Inc." was listed as the entity name in the upper right corner of the documents. Further, the employees claimed are the same twenty-five (25) employees as the other applications listed herein.

**Loan Numbers** ███**7206 and** ███**7800:** Applications were submitted to Fund-Ex Solutions by the following entities: Service Animals of America, Certapet Incorporated, and Therapy Pet Incorporated. On June 24, 2020, an employee of Fund-Ex Solutions filed an SBA Hotline compliant. The compliant noted that while the loans for Service Animals of America and Certapet Incorporated were applied for by **Gaughan**, and Therapy Pet Incorporated was filed by **Person 1**, all three claimed the same twenty-five (25) employees. These twenty-five (25) employees are the employees listed above that were utilized on applications across all of the lending institutions. The compliant further stated that all three applications included various tax forms with identical numbers for each entity.

**Loan Numbers** ████ **7807 and** ████ **7901:** Documents provided to Northeast Bank included the same twenty-five (25) employees mentioned above. Additionally, bank statements were provided for two separate entities: Official Service Dogs (Bank of America account ████9804) and Therapy Pet Inc. (Bank of America Account ████6270). Several months of statements were provided. All dollar amounts and transactions within those statements were identical. The only differences were the entity name and account number, suggesting the same statements were likely altered to be provided for two separate entities.

**Loan Number** ████ **7308:** Documents provided to Celtic Bank Corporation include a voided check that states the entity "Service Dog of America" in the upper left corner. But on the subsequent portions of the check, including the payment record, the entity shown on the upper left portion of the two sections states "Therapeutic". The check is drawn on Bank of America account ████6270. As exhibited above, during the 2018 search warrant executed on **Gaughan's** U Street Residence, multiple checks were found written to Gaughan from "Therapeutic" and drawn on Bank of America account ████6270. Based on this information, it is likely that this voided check was altered to suggest Service Dog of America controlled the bank account. In addition, the same twenty-five (25) employees listed above were utilized in an attempt to obtain loan number ████7308 from Celtic Bank Corporation. Payroll summary reports provided for all PPP loan documents received to date were identical, except for the entity name of "Service Dog of America" being in the upper right corner of the reports submitted to Celtic Bank Corporation.

### b.  Supporting Tax Forms

44.    A variety of federal tax forms were submitted as supporting documents for the following loans: Bank of America (loan number ████7708); Kabbage Inc. (loan number ████7303); Radius Bank (loan number ████7409); Fund-Ex Solutions Group (loan numbers ████7206 and ████7800); Northeast Bank (loan numbers ████7807 and ████7901); and Celtic Bank Corporation (loan number ████7308). These tax forms include Form 990, Return of Organization Exempt from Income Tax (Form 990), Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return (Form 940), and Form 941, Employer's Quarterly Federal Tax Return (Form 941).

45.     Form 990's are filed by tax-exempt organizations and are open to public inspection. The application for Loan Number ███7807 included a 2018 Form 990. Forms 990 filed after 2018 are available on IRS.gov through the Tax-Exempt Organization Search function. The Form 990 provided with the loan application is dated March 31, 2019.

46.     A search of the Applicant's Employer Identification Number (EIN) (███7450) yielded no Forms 990. The search did yield a determination letter dated February 25, 2020 determining that the Applicant is a tax-exempt organization. As the below return was not available on IRS.gov, and since the entity was not determined to be tax exempt until 2020, it is likely the Form was never filed with the IRS and is likely fraudulent.

47.     Of further note, the principal officer listed on the Form 990 is **Gaughan**. The application lists **Person 1** as the Applicant and principal officer for Official Service Dogs. The signature on the Form 990 appears to read "**Kenneth Gaughan**" even though the printed name is "Kevin Ganglof". Neither **Gaughan** nor Ganglof is listed as employees on the employee listing provided as supporting documentation.

48.     2019 Forms 940 were provided with at least three (3) applications for Official Service Dogs, Therapy Dog International, and Therapy Dog Incorporated. All three returns were signed on December 30, 2019 by **Person 1**, CFO. Two (2) of the three (3) Forms 940 were identical other than the EIN and Name. Forms 940 submitted for Therapy Dog International (loan number ███7708) and Therapy Dog Incorporated (loan number ███7303) have total payments to all employees of $1,709,301.97, FUTA tax before adjustments of $2,563.80, and Total FUTA tax after adjustments of $92,302.31. Based on the training and experience of other federal agents associated with this investigation, it is unlikely that two businesses would have equal payments to employees and FUTA tax balances for the same year. Additionally, it is unlikely that an entity

would complete and sign Forms 940 prior to year-end. These irregularities suggest that the Forms are likely fraudulent.

49.     2019 Forms 941 were provided for the first, second, third, and fourth quarters for the following entities: Service Animals of America (EIN ████2437); Therapy Pet Incorporated (EIN ████1364); Certapet Incorporated (EIN ████1218); and Therapy Dog Incorporated (████090). These Forms were identical in every way except for EIN, Name, and the signer. Not only were the Forms identical across entities, all numbers on the Forms were identical across months and quarters. Based on typical turnover for businesses employing twenty-five (25) employees, it is unlikely that each entity would consistently employ twenty-five (25) employees for an entire year with equal and even monthly earnings. It appears as if the Forms 941 were altered and duplicated to use as support for multiple loan applications.

50.     Based on the use of seemingly altered, duplicative Federal Tax Forms, it appears as if the Applicant utilized bogus documents to obtain PPP funding.

### III.     FRAUD ON THE SBA'S ECONOMIC INJURY DISASTER (EIDL) PROGRAM

51.     According to SBA records, **Gaughan** submitted applications for the following twelve (12) EIDL loans for businesses, which cited the same business address and purported in several cases to have identical gross revenues and/or costs across different business entities in other EIDL loan applications:

> **EIDL Application Number** ████**4152:** Application Number ████4152 was applied for by **Gaughan** directly with the SBA under the name Therapeutic Solutions Incorporated. According to SBA records, the applicant's business address was the 15th Street UPS box and the borrower's physical street address was ████████ Northeast, Washington, DC. According to the application, Therapeutic Solutions Incorporated has three employees, gross revenues of $210,000, and Non-Profit costs of operation of $210,000. **Gaughan** received a $3,000 advance payment as a result of this application. The email address listed on this EIDL application is help@esapet.org.

22

**EIDL Application Number** ████ **2063:** Application Number ████ 2063 was applied for by **Gaughan** directly with the SBA using the business name Anything Pawsable Incorporated. SBA records indicate the applicant's business address was the 15th Street UPS box and the borrower's physical street address was ████████ Northeast, Washington, DC. The application stated Anything Pawsable Incorporated has one employee, $110,000 in revenue, and $110,000 in cost of goods sold. No funds have been disbursed as a result of this application. The email address listed on this EIDL application is paxton7@aol.com.

**EIDL Application Number** ████ **7207:** Application Number ████ 7207 was applied for by **Gaughan** with the SBA using the business name Therapy Pet Incorporated. SBA records show that the applicant's business address was the 15th Street UPS box and the borrower's physical address was ████████ Washington, DC. The application stated Therapy Pet Incorporated three employees, gross revenues of $210,000, and Non-Profit costs of operation of $210,000. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is madams6119@gmail.com.

**EIDL Application Number** ████ **8932:** Application Number ████ 8932 was applied for by **Gaughan** with the SBA using the business name Therapy Dog International. SBA application data show the applicant's business address was the 15th Street UPS box and the borrower's physical address was ████████ Washington, DC. Therapy Dog International claimed to have three employees and gross revenues of $210,000 and Non-Profit costs of operation of $210,000. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is certifytherapydog@gmail.com.

**EIDL Application Number** ████ **7566:** Application Number ████ 7566 was applied for by **Gaughan** with the SBA using business name ESA Registry International. The applicant's business address was the 15th Street UPS box and the borrower's physical address was ████████ Northeast, Washington, DC. ESA Registry International claimed to have three employees and provided no revenue or cost information. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is esaregistryinternational@gmail.com.

**EIDL Application Number** ████ **1428: Gaughan** applied for loan Application Number ████ 1428 under the business name Official Service Dogs and listed the business address as the 15th Street UPS Box. The borrower address was ████████ Northeast, Washington, DC. Official Service Dogs listed three employees and did not provide gross revenue or cost information. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is richard.s.vost@gmail.com.

**EIDL Application Number** ████ **8301: Gaughan** applied for loan Application Number ████ 8301 under the business name Service Dog of America and listed three (3) employees. Per SBA application data, the business address provided was the 15th Street

23

UPS Box, and the borrower's address was ░░░░░░░░░░░ Washington, DC. Service Dog of America did not provide gross revenue or cost numbers. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is kengaughan@gmail.com.

**EIDL Application Number** ░░░░**4874: Gaughan** applied for Application Number ░░░░4874 under the business name Certapet Inc and listed three (3) employees. The application stated gross revenue of $210,000 and cost of goods sold totaling $210,000. The business address provided was the 15th Street UPS Box and the borrower's address was ░░░░░░░░░░░ Washington, DC. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is certapet@gmail.com.

**EIDL Application Number** ░░░░**1397:** Application Number ░░░░1397 was applied for by **Gaughan** using the business name Service Animals of America. Service Animals of America claimed to have three (3) employees and did not provide revenue or cost information. The business address provided was the 15th Street UPS Box and the applicant's address was ░░░░░░░░░░░ Washington, DC. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is intlserviceanimal@gmail.com.

**EIDL Application Number** ░░░░**9829: Gaughan** applied for Application Number ░░░░9829 under the business name International Service Animals. International Service Animals provided the business address of the 15th Street UPS box and claimed to have three (3) employees. The borrower's address was ░░░░░░ Northeast. International Service Animals did not provide revenue or cost numbers. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is serviceanimalsofamerica@gmail.com.

**EIDL Application Number** ░░░░**3683: Gaughan** applied for loan Application Number ░░░░3683 using business name Therapy Dog Incorporated claiming to have three (3) employees. Therapy Dog Incorporated's business address was the 15th Street UPS Box and the applicant's address was ░░░░░░ Northeast, Washington, DC. There were no revenue or cost numbers provided. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is atdugbartey@gmail.com. As stated above, Google has informed law enforcement that it has no record of this email address.

**EIDL Application Number** ░░░░**2533: Gaughan** applied for loan Application Number ░░░░2533 using business name US Therapy Dog. US Therapy Dog claimed three (3) employees and did not provide revenue or cost information. The business address provided was the 15th Street UPS Box and the applicant's address was ░░░░░░ Northeast, Washington, DC. As of July 22, 2020, no funds were disbursed as a result of this application. The email address listed on the EIDL application is rstrauski@gmail.com. As stated above, Gaughan is known to go by the alias **Richard Strauski**, and this email address was used to register the website for SCY in **Gaughan**'s scheme against ADW.

52.     In addition to the loans described in this affidavit, SBA records reflect that **Person 1** applied for a PPP loan in the name ███████████ with the address ███████████ ███████████ In contrast with the businesses associated with the 15th Street UPS box, the loan application for ███████████ shows that ███████████ has only a single employee and an average monthly payroll of $7,818. This loan has been disbursed and the outstanding balance is $19,545.   The email associated with this application was ███████████.com. **Person 1**'s LinkedIn profile reflects that he currently has two jobs— as the ███████████ of ███████████ (a position **Person 1** has held since January 2016), and as an ███████████ at ███████████. **Person 1**'s LinkedIn profiles does not reflect any involvement with animal support services.

### IV. EVIDENCE OF FRAUDULENT DOCUMENTATION RELATED TO THE PURPORTED BUSINESS USED TO OBTAIN PPP AND EIDL LOANS

53.     Records obtained from the internet domain registrar and web hosting company GoDaddy LLC show that an account with the login name "**kennethpgaughan**" reserved numerous internet domains similar to the businesses used to obtain the PPP loans, including:

- servicedogdirectory.com
- usservicedogregistry.net
- certapet.net
- certapets.com
- certapet.org
- certapets.org
- esaregistry.net
- esadirectory.com
- esadogregistry.org
- esadirectory.org
- therapetic.org
- therapetic.us
- therapypetdog.com
- therapypetdog.org

54.     The GoDaddy account used to register the foregoing domains listed the customer name as **Richard Strauski**, the company name as SCY, and the customer address as 1718 M Street NW, Suite 170, Washington, DC ("the M Street address"), which converted into the 15th Street UPS box.

55.     A search of electronic media seized from **Gaughan**'s U Street Residence revealed numerous service or support animal certificates purportedly signed by "**Richard Strauski**" certifying an animal as a service or emotional support animal that appeared to be issued by Therapetic. For example, a fraudulent support animal registration certificate that was purportedly signed by "**Richard Strauski**" listed the address of the 15th Street UPS box and stated that a dog "Tex" was "registered with TheraPetic's National Registry." The email address on the certification has the domain esadirectory.org, which **Gaughan** registered.  Similarly, your affiant discovered another fraudulent animal support certification, signed by **Strauski**, for a squirrel named Elly May. The certificate displayed the email address contact@therapetic.org and a logo for Therapetic Solutions.  Based on this, your affiant believes that **Gaughan** prepared the fraudulent certificates using the alias **Richard Strauski** in order to conceal his involvement.

56.     Similarly, while conducting a review of the electronic media seized from **Gaughan**, your affiant found an email letter from "**Richard Strauski**, Senior Legal Advisor" of Therapetic Solutions to an attorney at the law firm Wilson Sonsini Goodrich & Rosati confirming that Therapetic Solutions would voluntarily remove the logo of Hawaiian Airlines Incorporated from its website. Your affiant is aware that those who commit service animal fraud often represent that their certifications can be used to bring animals onto airplanes.  Your affiant found similar email letters from "**Richard Strauski**, Senior Legal Advisor" of Therapetic Solutions to JetBlue Airways Corporation and Alaska Airlines.

## V.      USE OF SBA PPP AND EIDL FUNDS

57.     Based on a review of records to date, your affiant suspects that **Gaughan** received a total of $2,182,465.00 in combined PPP and EIDL funds. Based on information received from Bank of America, **Gaughan** received the funds in two accounts in the name of Therapeutic Solutions Incorporated and Therapy Dog International between May 4, 2020 and May 26, 2020. As of July 27, 2020, the balance in the two accounts totaled approximately $200,000.

58.     Your affiant is aware of at least the following purchases and transfers out of the aforementioned accounts:

- On May 27, 2020, a cashier's check for $1,130,000 to Allied Title and Escrow LLC was purchased at Bank of America by Therapy Dog International to fund the purchase of ▆▆ ▆▆ NE, Washington, DC.

- On May 27, 2020, Therapeutic Solutions Incorporated sent a wire to AYS Marine Enterprise LLC for $295,550. The wire funded the purchase of a 2020 Cruisers Yachts 338 CX 33-foot watercraft.

- Between May 16, 2020 and July 15, 2020, at least $42,869.71 in likely proceeds were transferred to pay a Capital One credit card balance.

59.     Form 2483 explicitly states that by signing, the Applicant represents that "[t]he funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule: I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."  The above-mentioned use of PPP funds to purchase a residence, watercraft, and make personal credit card payments does not meet the certified use of funds requirements specified under the PPP Rule.

60.     On July 24, 2020, PROVIDER 1 was served with a preservation letter under 18 U.S.C.        § 2703(f)        related        to        serviceanimalsofamerica@gmail.com; ██████████@gmail.com;        certapet@gmail.com;        madams6119@gmail.com; certifytherapydog@gmail.com; esaregistryinternational@gmail.com; richard.s.vost@gmail.com; kengaughan@gmail.com; intlserviceanimal@gmail.com; and rstrauski@gmail.com.  On July 31, 2020, PROVIDER 2 was served with a preservation letter under 18 U.S.C. § 2703(f) related to help@esapet.org.  On August 7, 2020, PROVIDER 3 was served with a preservation letter under 18 U.S.C. § 2703(f) related to Paxton7@aol.com.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

61.     PROVIDER 1 is the provider of the internet-based accounts identified by serviceanimalsofamerica@gmail.com; ██████████@gmail.com; certapet@gmail.com; madams6119@gmail.com; certifytherapydog@gmail.com; esaregistryinternational@gmail.com; richard.s.vost@gmail.com;        kengaughan@gmail.com;        intlserviceanimal@gmail.com;        and rstrauski@gmail.com.

62.     PROVIDER 2 is the provider of the internet-based account identified by help@esapet.org.

63.     PROVIDER 3 is the provider of the internet-based account identified by Paxton7@aol.com.

64.     PROVIDER 1, PROVIDER 2, AND PROVIDER 3 provide its subscribers internet-based accounts that allow them to send, receive, and store e-mails online.  PROVIDER 1, PROVIDER 2, AND PROVIDER 3's accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's

username for other services of PROVIDER 1, PROVIDER 2, and PROVIDER 3, such as instant messages and remote photo or file storage.

65.     Based on my training and experience, I know that PROVIDER 1, PROVIDER 2, and PROVIDER 3 allow subscribers to obtain accounts by registering on the respective provider's website.  During the registration process, PROVIDER 1, PROVIDER 2, and PROVIDER 3 ask subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment.  PROVIDER 1, PROVIDER 2, and PROVIDER 3 typically do not verify subscriber names.  However, PROVIDER 1, PROVIDER 2, and PROVIDER 3 do verify the e-mail address or phone number provided.

66.     Once a subscriber has registered an account, PROVIDER 1, PROVIDER 2, and PROVIDER 3 provide e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username.  Subscribers of PROVIDER 1 and PROVIDER 2 can also use that same username or account in connection with other services provided by that respective provider. [6]

---

[6] Here, PROVIDER 1's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

67.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER 1, PROVIDER 2, or PROVIDER 3 account can be permanently stored in connection with that account, unless the subscriber deletes the material.  For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER 1, PROVIDER 2, and PROVIDER 3's servers indefinitely.  Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER 1, PROVIDER 2, and PROVIDER 3's servers for a certain period of time.

68.     Thus, a subscriber's account with PROVIDER 1, PROVIDER 2, or PROVIDER 3 can be used not only for e-mail but also for other types of electronic communication.  For PROVIDER 1, this includes instant messaging, photo and video sharing, voice calls, video chats, SMS text messaging, and social networking.  For PROVIDER 2, this includes contacts, calendars, and web hosting information, and access to Microsoft Office 365.  For PROVIDER 3, this includes address books, contact or buddy lists, calendar data, picture (other than ones attached to emails), and other files on servers maintained and/or owned by the email providers.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER 1, PROVIDER 2, and PROVIDER 3's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER 1, PROVIDER 2, and PROVIDER 3's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a subscriber of PROVIDER 1, PROVIDER 2, or PROVIDER 3 can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on their servers.  Based on my training and experience, I know that evidence

---

PROVIDER 2 is powered by Microsoft and its other services are supported by Microsoft Office (Outlook, Word, One Drive, Excel, Power Point, Teams, etc.).

of who controlled, used, and/or created a PROVIDER 1, PROVIDER 2, or PROVIDER 3 account may be found within such computer files and other information created or stored by the respective provider's subscriber.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

69.     Based on my training and experience, I know that providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 also collect and maintain information about their subscribers, including information about their use of PROVIDER 1, PROVIDER 2, and PROVIDER 3 services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account.  Also, providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 typically collect and maintain location data related to subscriber's use of the respective provider's services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

70.     Based on my training and experience, I know that providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers.

Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER 1, PROVIDER 2, and PROVIDER 3 in order to track what devices are using PROVIDER 1, PROVIDER 2, and PROVIDER 3's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI").  Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER 1, PROVIDER 2, or PROVIDER 3 accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the account with PROVIDER 1, PROVIDER 2, or PROVIDER 3.

71.    PROVIDER 1, and possibly PROVIDER 2 and PROVIDER 3, also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.  This application is associated with the subscriber's PROVIDER 1 account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER 1) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple

Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER 1 are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER 1 account via the mobile application.

72.     Based on my training and experience, I know that providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 use cookies and similar technologies to track users visiting a respective provider's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER 1, PROVIDER 2, and PROVIDER 3. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER 1, PROVIDER 2, and PROVIDER 3 account and determine the scope of criminal activity.

73.     Based on my training and experience, I know that PROVIDER 1, PROVIDER 2, and PROVIDER 3 maintain records that can link different PROVIDER 1, PROVIDER 2, and PROVIDER 3 accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER 1, PROVIDER 2, and PROVIDER 3 accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER 1, PROVIDER 2, or PROVIDER 3 account.

74.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER 1, PROVIDER 2, and PROVIDER 3 about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

75.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER 1, PROVIDER 2, and PROVIDER 3 are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER 1, PROVIDER 2, and PROVIDER 3 subscribers), as well as PROVIDER 1, PROVIDER 2, and PROVIDER 3-generated information about its subscribers and their use of

PROVIDER 1, PROVIDER 2, and PROVIDER 3 services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER 1, PROVIDER 2, and PROVIDER 3 with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

76.    As explained above, information stored in connection with a PROVIDER 1, PROVIDER 2, and PROVIDER 3 account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a PROVIDER 1, PROVIDER 2, and PROVIDER 3 account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER 1, PROVIDER 2, and PROVIDER 3 can show how and when the account was accessed or used.  For example, providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER 1, PROVIDER 2, and PROVIDER 3 account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate

or exculpate the person who controlled, used, and/or created the account.   Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail).   Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation.   For example, information in the PROVIDER 1, PROVIDER 2, and PROVIDER 3 account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[7]

77.   Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER 1, PROVIDER 2, or PROVIDER 3 account may be found within the user-generated content created or stored by the PROVIDER 1, PROVIDER 2, and PROVIDER 3 subscriber.   This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.   In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.   This is true for at least two reasons.   First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined

---

[7] At times, internet services providers such as PROVIDER 1, PROVIDER 2, and PROVIDER 3 can and do change the details and functionality of the services they offer.   While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER 1, PROVIDER 2, and PROVIDER 3's services in connection with submitting this application for a search warrant.   Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER 1, PROVIDER 2, and PROVIDER 3 accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

**REQUEST TO SUBMIT WARRANT BY TELEPHONE
OR OTHER RELIABLE ELECTRONIC MEANS**

78.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Christine Macey, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

**CONCLUSION**

79.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER 1, PROVIDER 2, and PROVIDER 3, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Daniel Rzepecki
Special Agent
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on August 10, 2020

2020.08.10 17:20:49 -04'00'

G. Michael Harvey
UNITED STATES MAGISTRATE JUDGE

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC<br>RECORDS PURSUANT TO FEDERAL RULES OF<br>EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____      _____
Date                                         Signature